04-17363.remand.ord.wpd

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ERNESTO SOLIS,              :

                           :      Case No. 1:04-CV-17363

         Plaintiff,     :

                           :      JUDGE O'MALLEY

   v.                   :

                           :      MEMORANDUM AND ORDER

LINCOLN ELECTRIC CO., et al.,    :

                           :

        Defendants    :

For the reasons stated below, plaintiff Ernesto Solis's motion to remand his case to the Southern District of Texas for trial (docket no. 7) is **DENIED**.[1]

## I. Background.

Beginning in early 2003, a number of plaintiffs around the country began filing lawsuits against various manufacturers, suppliers, and distributors of welding rod products, as well as related trade associations. The common theme of these lawsuits was that exposure to fumes given off by welding rods caused neurological harm to the plaintiffs, and the defendants knew or should have

---

[1] As discussed below, it is actually the Federal Judicial Panel on Multi-District Litigation ("MDL Panel"), and not the transferee court, that remands a transferred case to the originating court. Because the MDL Panel usually awaits a suggestion of remand from the transferee court, however, this Order sometimes uses shorthand terminology and refers to a "remand by the transferee court," rather than "a suggestion for remand by the transferee court to the MDL Panel." *See Manual for Complex Litig. Fourth* §20.132 at 225 ("The Panel looks to the transferee court to suggest when it should order remand, but that court has no independent authority to order section 1407 remand."). Solis uses the same shorthand when he moves this Court to remand his case to the transferor court for trial; what he actually seeks is a suggestion of remand from this Court to the MDL Panel.

known that use of the welding rods caused these injuries.

The plaintiffs in one of these cases filed a motion with the Federal Judicial Panel on Multi-District Litigation ("MDL Panel"), seeking to consolidate and centralize all related federal lawsuits, pursuant to 28 U.S.C. §1407.  MDL docket no. 1535.  On June 23, 2003, the MDL Panel granted the motion, consolidating and transferring all related pending federal litigation to the Northern District of Ohio and assigning oversight of the MDL proceedings to the undersigned.

After substantial discussion with the parties, the Court entered an initial Case Management Order ("CMO") on December 9, 2003, which addressed issues such as attorney organization, pleading and filing issues, discovery, and so on.  *See* docket no. 63.  The bulk of the provisions contained in the initial CMO were negotiated by the parties, with the Court's input.  *See* docket no. 37 (parties' joint submission of proposed initial CMO).  With few exceptions, this model of jointly-suggested case management procedures has continued throughout this litigation.[2]

Once discovery was under way, the parties and the Court turned their attention to the question of what would happen after discovery had concluded.  The parties and the Court agreed that an appropriate mechanism to assess the strengths and weaknesses of the parties' different positions would be for this Court to preside over a number of "bellwether trials" (sometimes also referred to as "MDL trials").  The initial concept was that the Court would try three cases. Although the issues in each case would overlap, the thrust of the first trial would be to test the strength of the plaintiffs'

---

[2]  Virtually all of the changes to case management deadlines and procedures throughout this litigation have been submitted *jointly* by the parties, although the parties have sometimes solicited input from the Court to ensure the Court is amenable to their agreements.  *See, e.g.*, docket no. 384 (stipulated motion for order amending CMO, dated Aug. 20, 2004); docket no. 723 (joint motion for entry of third CMO, dated Jan. 9, 2004); docket no. 945 (joint motion for entry of fourth CMO, dated Mar. 18, 2005); docket no. 1264  (joint motion for entry of sixth CMO, dated June 30, 2005); docket no. 1288  (joint motion for entry of seventh CMO, dated July 13, 2005).

claim that welding fumes can cause the neurological condition known as manganism; the second trial would focus on the plaintiffs' claim that the manufacturers' warnings were inadequate; and the third trial would focus on the plaintiffs' claim that welding fumes can cause "subclinical" neuropsychiatric injury, without also causing obvious physical injury.

Accordingly, the Court entered a "Second Amended Supplemental Case Management Order" containing the following provision:

> By agreement of the parties, the Court intends to schedule three initial trials in this MDL proceeding, each to be selected with an eye to providing opportunities for educating the Court and the parties regarding the science and other issues that are likely to recur in litigating individual cases. The parties shall confer and, in consultation with the Court, shall make the designation of the first case to be tried on or before September 15, 2004. The trial of that case shall commence on May 2, 2005, with the Court reserving three weeks for the completion of that proceeding.

Docket no. 405 at 5, ¶IV.1 (Aug. 31, 2004). The Order further stated that "the parties shall confer and, in consultation with the Court, shall make the designation of the other two cases to be tried *before this Court* on or before November 1, 2004." *Id.* at 5 ¶IV.2 (emphasis added).

When it came time for the parties to designate the "other two cases to be tried before this Court," however, the parties could not reach agreement. The primary stumbling block was that the defendants did not believe plaintiffs' other two choices were "representative," while plaintiffs did not believe defendants had a right to veto their choices. The Court resolved this dispute by agreeing to hold a total of four bellwether trials. The first, second, and fourth bellwether trials would be cases picked by the plaintiffs. As to the third bellwether trial, the Court ordered as follows:

> By March 22, 2005, Defendants' Liaison Counsel shall identify 7 - 10 representative plaintiffs as candidates for the third MDL trial. By April 5, 2005, Plaintiffs' Co-Lead Counsel shall select one of these plaintiffs for the third MDL trial. The trial of that case is set to begin on February 6, 2006.

Docket no. 959 ("Fourth Case Management Order") at 1, ¶I.3.[3]  The Court and the parties began to refer to the first, second, and fourth bellwether trials as the "plaintiffs' picks" and the third bellwether trial as the "defendants' pick."

Unfortunately, the idea of trying MDL cases to " educat[e] the Court and the parties regarding the science and other issues that are likely to recur in litigating individual cases" has not yet come to fruition.  The first bellwether case, involving plaintiff Charles Ruth, settled on the eve of trial.[4]  After the plaintiff in the second bellwether case, Dewey Morgan, was shown a surveillance videotape of himself, he filed a motion to voluntarily dismiss.[5]  The result is that the third bellwether case is now the first that will actually be tried before this Court – currently scheduled to begin on June 1, 2006 – and the plaintiff in that case is "defendants' pick."[6]

With regard to whom the "defendants' pick" actually is, the defendants, as ordered, identified seven candidates for the third bellwether trial; the defendants believed these candidates are more representative of the mass of plaintiffs, generally, than the plaintiffs' picks.  In April of 2005, the plaintiffs chose Scott Landry from the defendants' list of candidates.  In early November of 2005,

---

[3]  The February 6, 2006 date was subsequently changed to June 1, 2006.

[4]  *Ruth v. A.O. Smith Corp.*, case no. 04-CV-18912.

[5]  *Morgan v. Lincoln Elec. Co.*, case no. 04-CV-17251.

[6]  Plaintiffs have chosen Darwin Peabody's case for the fourth bellwether trial (*Peabody v. Airco, Inc.*, case no. 05-CV-17678), currently scheduled for August 15, 2006.

however, the plaintiffs informed the Court that Landry had decided not to prosecute his case.[7] Plaintiffs perused again the defendants' list of candidates and, in mid-November of 2005, chose Ernesto Solis. Since that date, the parties have engaged in Solis-specific discovery and have been preparing for the June 1, 2006 trial.

## II. Analysis.

Notably absent from the above recitation of facts is any suggestion that any of the MDL trials would take place in a venue other than the one where the undersigned sits – the Northern District of Ohio. To the contrary, all of the communications between the parties and the Court (both formal and informal) confirm that the Court's education was to occur via MDL trials that would go forward *in this transferee court*. Thus, in the first planned bellwether trial (involving plaintiff Charles Ruth), the matter had proceeded to the point that members of a jury venire from this district had filled out questionnaires; the case settled only a few days before trial. Although the plaintiff chosen for the second bellwether trial (Dewey Morgan) has moved to dismiss his case, the Seventh Case Management Order reflects clearly the understanding that the case was to be tried in the "United States District Court, Northern District of Ohio, Eastern Division." Docket no. 1289 at 1; *see id.* ("Plaintiffs have selected Dewey Morgan as the plaintiff for the second MDL trial, which is set to commence on November 14, 2005, at 9:00 a.m."). Certainly, there was no hint from any party, including Morgan, that the trial might occur anywhere else. And, during the period of time that Scott

---

[7]  *Landry v. Nichols Wire, Inc.*, case no. 03-CV-17016. Plaintiffs made Landry's decision known to the Court on the record during a conference on November 8, 2005. On December 16, 2005, Landry filed a formal motion to voluntarily dismiss. The defendants have asked the Court not to rule on this motion until after a hearing, but it is clear that Landry's case is not going forward. Plaintiff Morgan's case has an identical procedural status.

Landry had been designated as the plaintiff for the third bellwether trial, the circumstances were the same.[8]

Only after the plaintiffs announced they were replacing Landry with Solis, in what was originally scheduled to be the third bellwether trial, has there been any hint that the plaintiffs wanted a bellwether trial to take place in a different venue.  Specifically, on January 11, 2006, Solis filed a motion to remand his case to the Southern District of Texas, which is the transferor court.  Solis adds that, if his case is remanded, he would immediately "urge the transferor court to appoint [the undersigned] as trial judge per 28 U.S.C. §292.[9]

Solis advances three reasons behind his request for remand.  First, Solis asserts that the great majority of fact witnesses are from the Southern District of Texas, so trial in that venue would be much more convenient for the parties and witnesses.  Second, Solis notes that his original choice was to have his jury venire drawn from the area surrounding Corpus Christi, Texas, not Cleveland, Ohio,

---

[8]  Given the timing of Landry's motion for voluntary dismissal, the Court never entered a CMO with discovery cut-off and other dates specific to his case.  The Fourth CMO, however, had earlier set trial dates for the second, third, and fourth MDL trials, and Landry was slotted for the third MDL trial.  The Fourth CMO, of course, was also issued by the "United States District Court, Northern District of Ohio, Eastern Division."  Docket no. 959 at 1-2.

[9]  28 U.S.C. §292 provides:
* * *
(b) The chief judge of a circuit may, in the public interest, designate and assign temporarily any district judge of the circuit to hold a district court in any district within the circuit.
* * *
(d) The Chief Justice of the United States may designate and assign temporarily a district judge of one circuit for service in another circuit, either in a district court or court of appeals, upon presentation of a certificate of necessity by the chief judge or circuit justice of the circuit wherein the need arises.

and that "cultural distinctions" continue to justify this choice.[10] And third, Solis argues that the multi-district litigation statute *requires* this Court to remand his case to the transferor court for trial. This last argument, of course, is the most serious, so the Court addresses it first.

To support his motion for remand, Solis cites 28 U.S.C. §1407(a). This statute begins by authorizing the creation of MDL courts: "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred [by the MDL Panel] to any district for coordinated or consolidated pretrial proceedings." *Id.* The statute then sets out an explicit directive regarding the MDL transferee court's authority over a given case, once pretrial proceedings for that case are complete: "Each action so transferred *shall* be remanded by the [MDL Panel] at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." *Id.* (emphasis added). Put simply, the statute charges MDL courts with getting cases trial-ready, and then remanding them to the originating, transferor courts for trial.[11]

The interplay of the directive to remand in §1407 with other venue statutes was examined by the Supreme Court in *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 37 (1998). In *Lexecon*, the MDL Panel transferred a case originally filed in the Northern District of Illinois to an "MDL court" in the District of Arizona. Once pretrial proceedings were over, the plaintiff requested his case be remanded back to Illinois. Instead, the Arizona MDL court granted

---

[10]  Solis submits census data showing that the percentage of the population that is Hispanic is 54% in Corpus Christi and 8% in Cleveland.

[11]   Again, it is actually the MDL Panel that remands a transferred case; the Court's terminology is shorthand.

a defense motion to transfer the case to itself, pursuant to 28 U.S.C. §1404(a),[12] and tried the case. After defendants won at trial, the plaintiff appealed the validity of the Arizona court's §1404(a) transfer of the case to itself.

The Supreme Court reversed, concluding that "a district court conducting pretrial proceedings pursuant to section 1407(a) has no authority to invoke section 1404(a) to assign a transferred case to itself for trial." *In re: Carbon Dioxide Industry Antitrust Litig.*, 229 F.3d 1321, 1324 (11th Cir. 2000) (citing *Lexecon*, 523 U.S. at 40-41). The *Lexecon* court found that the directive in §1407(a) is an "unconditional command," creating "an obligation impervious to judicial discretion," so that the trial court's transfer to itself was invalid. *Lexecon*, 523 U.S. at 36, 35. The Supreme Court applied this rule even though it worked to nullify a completed trial, and noted that the rule adheres even when the transferee and transferor courts both agree that the transferee court should try the case.[13]

A critical qualifier to the *Lexecon* analysis, however, is that §1407(a) is not a *jurisdictional* limitation, but simply "a venue statute that . . . limits the authority of courts (and special panels) to override a plaintiff's choice." *Id.* at 42; *see In re: Carbon Dioxide*, 229 F.3d at 1326. This qualifier is critical because "venue is personal and waivable." *Catz v. Chalker*, 142 F.3d 279, 284-85 (6th Cir.

---

[12]  28 U.S.C. §1404(a) states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

[13]  Indeed, the originating, transferor court may grant a motion to transfer venue *back to* the transferee court, pursuant to §1404(a), *after* the transferee court has remanded the case to the originating court, pursuant to §1407(a); but the transferee court may not skip a step and grant a §1404(a) transfer itself.   As *Lexecon* explains: "the question is not whether a change of venue may be ordered in a case consolidated under §1407(a); on any view of §1407(a), if an order may be made under §1404(a), it may be made after remand of the case to the originating district court.   The relevant question for our purposes is whether a transferee court, and not a transferor court, may grant such a motion." *Lexecon*, 523 U.S. at 39 (footnote omitted).

1998), *amended*, 243 F.3d 234 (6ᵗʰ Cir. 2001).  Thus, a plaintiff may decide not to raise an otherwise-valid objection to venue and "consent to remain in the transferee district for trial."  *Manual for Complex Litig. Fourth* §21.132 at 224.

In this case, there is no question but that Solis has consented to trial in the transferee district and has waived any objection based on venue.

In explanation, it must be noted at the outset that, because this Court has now presided over three separate multi-district litigation dockets, it has long been familiar with the issue addressed by *Lexecon*.  *See, e.g.,* Annual Status Letter from the undersigned to the Judicial Panel on Multi-District Litigation regarding *In re: Inter-op Hip Prosthesis Prod. Liab. Litig.*, MDL No. 1401  (July 17, 2003) ("Several of the lawyers indicated a belief that *Lexecon* interferes with a transferee judge's ability to broker a meaningful resolution of coordinated cases where there are a high volume of claimants.  Counsel also suggested the need for a legislative expansion of the jurisdiction of the transferee judge in MDL proceedings.").  Accordingly, when the parties were negotiating the concept of holding bellwether trials, this Court explicitly directed the parties to choose cases that presented no *Lexecon* trial impediment.  Specifically, the Court raised the *Lexecon* issue with the parties and informed plaintiffs that any designated trial candidates would need to: (1) have filed their actions directly in this Court; (2) waive any venue objections they might have; or (3) cure venue issues by re-filing their complaints in this Court.

That all parties, including the plaintiffs, understood this direction is inherent in all of what occurred after the  meeting with counsel where the Court and the parties agreed to the bellwether trials.  As early as August of 2004, the plaintiffs agreed "to schedule three initial trials in this MDL proceeding," which were "to be tried before this Court."  Docket no. 405 at 5, ¶IV.1, 2.  This plan

9

could only succeed if the plaintiffs waived any objection to venue they might have had under §1407. *See Manual for Complex Litig. Fourth* §20.132 at 224-25 (setting out various mechanisms that "permit the transferee court to resolve multidistrict litigation through trial while remaining faithful to *Lexecon* limitations"). Ever since August of 2004, all of the Court's case management orders – the entry of nearly all of which the plaintiffs joined or stipulated in seeking – have reflected the Court's and the parties' understanding regarding where the bellwether trials would take place. That place is the Northern District of Ohio.

Plaintiffs' actions in connection with their designation of Charles Ruth as the first designated bellwether plaintiff are particularly telling on this point. Before the parties reached agreement regarding the concept of holding bellwether trials, this Court had granted plaintiffs' motion to remand the *Ruth* action to Mississippi state court, where it had originated. When plaintiffs decided they wanted *Ruth* to be the first MDL bellwether trial, the Mississippi state court case was dismissed and the action was re-filed directly in this Court.[14] While a dismissal and re-filing was not necessary as to the second and third bellwether candidates – Morgan and Landry – there is no question but that their designation as plaintiffs in this process pre-supposed a waiver of any objection to venue in this district. *Morgan* was filed directly in the Northern District of Ohio, while *Landry* was filed in, and transferred here from, the Eastern District of Louisiana. All parties proceeded on the assumption that both cases would be tried in this district. In other words, all of plaintiffs' actions in this litigation, to

---

[14] The Court's earlier remand of the *Ruth* case back to Mississippi state court was based on the defendants' failure to timely remove. *See* docket no. 148. The parties subsequently agreed, however, that it was appropriate for this Court to try *Ruth* as the first bellwether case, so the plaintiffs dismissed the remanded action and re-filed the *Ruth* case directly in this Court. Compare *Ruth v. Lincoln Elec. Co.*, case no. 03-CV-17003 (remanded to Mississippi state court) with *Ruth v. Lincoln Elec. Co.*, case no. 04-CV-18912 (filed directly in this Court).

this point, confirm that, as to those plaintiffs designated for treatment as a bellwether case, they agreed to waive any venue-based objection to this Court's trial of those cases.[15]

In similar circumstances, the Eleventh Circuit Court of Appeals easily concluded that *Lexecon* was distinguishable. In *In re: Carbon Dioxide*, plaintiffs from Mississippi and California moved the Florida MDL district court to remand their cases to the districts in which they were originally filed. The district court denied this motion, and the appellate court affirmed. The Eleventh Circuit's reasoning was simple: "If the Mississippi and California Plaintiffs believed that they had a right to have their cases remanded to their original districts, they should not have asked the [MDL] court to try the case in Orlando." *In re: Carbon Dioxide*, 229 F.3d at 1326. Similarly, because the plaintiffs in this case joined the defendants in "explicitly request[ing]" that this MDL court try all of the bellwether cases, and themselves chose to designate Solis (as distinct from some other plaintiff from defendants' list of candidates for the third bellwether trial), Solis's argument that §1407(a) now requires this Court to remand his case to the Southern District of Texas, where it originated, is not

---

[15]  While it is true that Solis was chosen by plaintiffs from a larger list originally suggested by defendants, it is also true that, if plaintiffs had lingering venue concerns as to Solis, they could have identified some other plaintiff from that list for this expedited trial process.

well-taken. *Id.* at 1322.[16]

This leaves the other two arguments mustered by Solis for transfer of his case back to Texas: (1) it would be more convenient for the parties and witnesses; and (2) cultural differences between Corpus Christi and Cleveland justify his desire to draw from a Texas jury venire. While these arguments are not without some weight, and together might carry the day in a different, non-MDL context, the Court cannot examine these factors in isolation.[17] At least twice, the Court has designated four-week periods of time to hold a bellwether MDL trial, to "educat[e] the Court and the parties." Twice, those periods have gone unused for their intended purpose.[18] The importance of holding an MDL bellwether trial as soon as reasonably possible outweighs the two factors

---

[16] Two additional points deserve brief mention. First, it has always been clear that plaintiffs' lead counsel in this case was speaking for *all* those plaintiffs who were candidates for bellwether trials, including those on the defendants' list of candidates for the third bellwether trial. Plaintiffs have not suggested that the parties' *general* agreement to hold all of the bellwether trials in the Northern District of Ohio did not work to bind a *specific* bellwether plaintiff (such as Solis); still, the Court makes clear here that any such argument would be a rewriting of history. Second, it is only fair to note that, in *In re: Carbon Dioxide*, the plaintiffs "stipulated at the final pretrial conference" that venue was proper in the MDL court; the plaintiffs sought to avoid this stipulation and obtain remand only after other plaintiffs settled on the eve of trial, leaving the remaining plaintiffs without lead counsel. *In re: Carbon Dioxide*, 229 F.3d at 1325, 1326 n.8. In this case, there is no similar, explicit stipulation to venue on the record as to this *specific* plaintiff. Nonetheless, the Court is confident that the record reflects the plaintiffs' longstanding agreement that the bellwether cases would be tried by the undersigned in her home venue, such that any appeal of this case will not be "[]encumbered by potentially thorny issues such as the Northern District of Ohio's ability to hear this case in the first instance." Motion to remand at 5.

[17] Though, as defendants note, the actual importance of these factors to Solis is undercut severely by the fact that he was one of 2,400 plaintiffs who joined in filing a welding fumes complaint in Marshall County, West Virginia state court – a venue which is probably even less convenient to Texas-based witnesses than is Cleveland and, according to census data, is certainly less Hispanic (0.6%). Solis's West Virginia case was removed to federal court, transferred to this Court, and recently voluntarily dismissed (*Solis v. AGA Gas, Inc.*, case no. 04-CV-22251).

[18] In fact, due to scheduling changes and motions by plaintiffs Morgan and Landry to voluntarily dismiss, the Court has reserved unused trial periods a number of times.

identified by Solis.  It is also worth noting that the same two factors would have militated in favor of trials in the home venues of plaintiffs Ruth, Morgan, and Landry.  The plaintiffs understood, however, that these two factors were outweighed by the importance of timely conducting the bellwether trials as a part of the larger MDL proceedings, before the undersigned.

In sum, the Court concludes that plaintiff Solis's motion, asking this Court to suggest to the MDL Panel that it remand his case to the originating court, is not well-taken.  In light of the history of plaintiffs' actions in this case, there is no doubt that Solis has waived any objection to venue in the Northern District of Ohio.  Furthermore, the other factors identified by Solis do not justify annulling the plaintiffs' agreement to try the third bellwether case before the undersigned, as soon as reasonably possible.

### III.  Conclusion.

As a general matter, the Court is not averse to plaintiffs' suggestion that it "seek an intercircuit or intracircuit assignment pursuant to 28 U.S.C. §292 or 294 and follow a remanded action, presiding over the trial of that action in th[e] originating district." *Manual for Complex Litig. Fourth* §20.132 at 225.  Moreover, this Court will not reach to overcome the limitations imposed by *Lexecon* simply for its own convenience.  But the circumstances of this case make clear that: (1) based on conscious and deliberate choices made by plaintiffs in an effort to expedite the trial of certain specific cases in this MDL, *Lexecon* does not apply; and (2) invocation of §292 or 294 is unnecessary to ensure the undersigned presides over Solis's trial.  Because plaintiffs' lead counsel waived any objection based on venue in all four bellwether trials, this Court may properly try Solis's case, and his motion for suggestion of remand must be denied.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**:  February 1, 2006

14